Dear Representative Bastin,
¶ 0 This office has received your request for an Attorney General Opinion in which you ask, in effect, the following question:
Under Oklahoma law, may the Oklahoma Cerebral Palsy Commissioncontinue to extend indefinitely the agreement entered into inNovember 1995, to sell the real estate on which the Commissionoperates the J.D. McCarty Center for Children with DevelopmentalDisabilities without opening up the property for further bids?
¶ 1 The Oklahoma Cerebral Palsy Commission is an agency of the State of Oklahoma created and empowered by 63 O.S. Supp. 1997, §485.1[63-485.1]. The primary mission of the Commission is "to provide a specialized hospital, which shall be named the J.D. McCarty Center for Children with Developmental Disabilities, for the care, maintenance, training, treatment, and general mental and physical rehabilitation of the residents of the state . . . who may be afflicted with cerebral palsy or other developmental disabilities." Id. No other facilities are operated by the Commission.
¶ 2 The information provided with your question establishes that the Oklahoma Cerebral Palsy Commission (herein "the Commission") holds title for the State to approximately ten (10) acres of real estate located in Cleveland County, Oklahoma. Since 1949, the property and its improvements have been used by the Commission as the J.D. McCarty Center for Children with Developmental Disabilities. In 1995, the Commission determined that it needed a new facility. It developed a plan to seek funding from the Legislature for a new facility based, in part, upon a contract to sell the existing facility which was contingent upon funding by the Legislature. Although, in 1995 as now, the Commission's statutory powers allow it to "[e]nter into contracts . . . to buy or sell real estate" 63 O.S. Supp. 1995,§ 485.3[63-485.3](A)(2),[1] it had no specific procedures to follow as required by Title 74:
 1. Unless procedures for the disposal of real property owned by this state are otherwise provided for by law, no department, board, commission, institution, or agency of this state shall sell, exchange, or otherwise dispose of such real property subject to its jurisdiction except as provided in subsection B of this section.
 2. Every department, board, commission, institution, or agency, upon legislative authorization to dispose of a parcel of real property or upon a determination, in writing, by said department, board, commission, institution, or agency, that a parcel of real property subject to its jurisdiction is no longer needed by said department, board, commission, institution, or agency, shall request the [Department of Central Services][2] to dispose of said property.
74 O.S. 1991, § 129.4[74-129.4] (emphasis added).
¶ 3 In 1995 the Commission requested the Department of Central Services (herein "DCS") to solicit public bids for the sale of the property, with the requirement that any sale be contingent upon the Legislature's approval and funding. Thus, DCS utilized the procedures in 74 O.S. 1991, § 129.4[74-129.4](B) to appraise the property, to issue public notice, and to select the highest bidder offering to pay at least 90 percent of the appraised value. The proceedings were conducted twice because there were no bids submitted the first time. In October 1995, at the second bid opening, DCS accepted the highest bid in the amount of $1,625,001.00. Subsequently, in November 1995, the Commission and the successful bidder (herein "the Parties") executed a contract in writing documenting the sale and agreeing to various details necessary to close the transaction, including a schedule whereby the property would be conveyed in separate parcels at varying times so as to permit the Commission to continue to operate the existing hospital during construction of the new facility.
¶ 4 Notwithstanding these other considerations, the contract provided as a condition precedent to closing the sale, that the Commission must obtain "approval and funding from the Oklahoma Legislature to relocate the J.D. McCarty Center and construct new facilities. This approval is anticipated to be effective July 1, 1996.[3] Because the 1996 session of the Legislature ended without such approval and funding, the Parties agreed to extend the contract with a restated legislative approval date of July 1, 1997. In like manner, the 1997 session of the Legislature also ended without the approval and funding, and the Parties again agreed to extend the contract with a restated legislative approval date of July 1, 1998. Prior to that agreement the property was reappraised according to DCS procedures, and the contract price remained within ninety percent (90%) of the new appraisal.
¶ 5 In response to your question, we have reviewed the Oklahoma Statutes and court decisions to determine if the Commission may continue to extend indefinitely the agreement to sell the State's real property without requesting further bids.
¶ 6 Upon receiving the Commission's request to dispose of the real property subject to the funding contingency, Section 129.4(B)(2) of Title 74 required DCS to take the following actions to execute the transaction:
 a. obtain three new and complete appraisals of such property. . . .
 b. cause notice of such sale to be published for at least one (1) day . . . statewide . . . and for at least three (3) consecutive weeks . . . in the county . . .; and
 c. offer said property through public auction or sealed bids. . . . The property shall be sold to the highest bidder. [DCS] shall not accept a bid of less than ninety percent (90%) of the appraised fair value of the property and the improvements on such property. [DCS] is authorized to reject all bids.
 3. . . . . All monies received from the sale or disposal of said property, except those monies necessary to pay the expenses incurred pursuant to this section, shall be deposited in the General Revenue Fund.
74 O.S. 1991, § 129.4[74-129.4](B).
¶ 7 "The primary goal of statutory construction is to determine legislative intent. That intent is to be ascertained from the statute in light of its general purpose and object. It is presumed that the legislature has expressed its intent in a statute and that it intended what it so expressed. The statute should then be interpreted to attain that purpose and end." TXOProduction Corporation v. Oklahoma Corporation Commission,829 P.2d 964, 968-969 (Okla. 1992).
¶ 8 The procedures required by 74 O.S. 1991, § 129.4[74-129.4](B)(2) are concerned with establishing the value of the property by competitive means prior to DCS's declaration of sale; first by three new appraisals, followed by four public notices to encourage participation, and a minimum acceptable bid based upon the appraisals. The statute authorizes DCS to accept the highest bid of at least ninety percent (90%) of the appraised value.Id. Upon DCS's acceptance of the bid, the property was considered sold under Section 129.4(B). Such sale became a contract made on behalf of the State, subject to all the terms and conditions stated in the invitation to bid. However, Section 129.4(B) is silent as to the time period in which a sale must be consummated after acceptance of a bid.
¶ 9 In Oklahoma, Title 15 of the Oklahoma Statutes is the fundamental law as to contracts. We observe that 15 O.S. 1991, §151[15-151] requires that "[a]ll contracts, whether public or private, are to be interpreted by the same rules, except as otherwise provided by law." Further, "[t]ime is never considered as of the essence of a contract, unless by its terms expressly so provided." 15 O.S. 1991, § 174[15-174]. Rather, "[i]f no time is specified for the performance of an act required to be performed, a reasonable time is allowed." 15 O.S. 1991, § 173[15-173].
¶ 10 In response to your question, repeated extensions of the contract to sell the State's real property which causes the agreement to become "indefinite" in nature would, as a matter of law, not be performed within a reasonable time under 15 O.S.1991, § 173[15-173]. The determination as to what constitutes a reasonable time is a fact question beyond the scope of an Attorney General Opinion. 74 O.S. Supp. 1997, § 18b[74-18b](A)(5).
¶ 11 Here, it was the agency which requested and needed to delay the execution of the closing so that it could satisfy its contingency by receiving the approval and funding needed for the new facility. Thus, in the original contract both parties anticipated the agency's need for time to seek approval and funding, at least through the 1996 legislative session. As stated above, the Parties subsequently agreed by written amendments to the contract to specific dates for legislative approval, first July 1, 1997, then re-amended to July 1, 1998. In Oklahoma, "[a] contract in writing may be altered by a contract in writing." 15O.S. 1991, § 237[15-237]. Because the Commission was authorized to make contracts to buy and sell real property, 63 O.S. Supp. 1995, §485.3[63-485.3](A)(2), it was also authorized thereby to utilize 15 O.S.1991, § 237[15-237] to alter the contract by mutual agreement with the other party, as long as it was not otherwise prohibited by law as an agency of the State.
¶ 12 Our review has found no Oklahoma statute or case law which would prevent the Commission from honoring the existing amendments to the contract or agreeing to further extend the legislative approval date. However, repeated extensions, causing the contract to become indefinite in nature, would not satisfy the performance within a reasonable time requirement of 15 O.S.1991, § 173[15-173]. Therefore, the Oklahoma Cerebral Palsy Commission could continue to extend the agreement to sell the real estate on which the Commission operates the J.D. McCarty Center for Children with Developmental Disabilities entered into in November 1995, without receiving further bids to purchase the property, as long as said contract is performed within a reasonable time.
¶ 13 It is, therefore, the official Opinion the AttorneyGeneral that:
 The Oklahoma Cerebral Palsy Commission could continue toextend the agreement to sell the real estate on which theCommission operates the J.D. McCarty Center for Children withDevelopmental Disabilities entered into in November 1995, withoutreceiving further bids to purchase the property, as long as saidcontract is performed within a reasonable time. 15 O.S. 1991, §173[15-173].
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
JOHN CRITTENDEN ASSISTANT ATTORNEY GENERAL
[1] 63 O.S. Supp. 1997, § 485.3[63-485.3](A)(5).
[2] In 1992, the Office of Public Affairs was renamed the Department of Central Services. 1992 Okla. Sess. Laws ch. 37, § 2.
[3] "Real Estate Purchase Agreement," dated November 17, 1995, with the Oklahoma Cerebral Palsy Commission and J.D. McCarty Center for Children with Developmental Disabilities as Seller and Altus Property Company as Purchaser.